The first case is Kurtz v. Costco Wholesale Corporation. Good morning Judge Livingston and may it please the court. I'm Eamon Joyce on behalf of Kimberly-Clark. I intend to focus on the arguments about the class action standards, deception and causation. My friend Mr. Matsui will address the price premium related issues in Article 3 standing. I have three primary points. First, the court erred as a matter of law in adopting pro-certification presumptions. Contrary to plaintiff's suggestion, nothing about that was harmless. Second, on this record, the court erred by finding deception a common, predominating issue, even though plaintiff failed to demonstrate how reasonable consumers understand flushable and Kurtz's own definition would require individualized evidence to prove non-conformance with the flushable label. Third, the court wrongly ignored individualized inquiries on causation, simply because the GBL has no reliance requirement. But what the court did was erroneously treat reliance and causation as identical, despite that the New York Court of Appeals has said they're not the same thing. Starting with the first point. I thought it went out of its way to distinguish reliance and causation. I don't think it did, Judge Lohier. It said it was doing so. But under Judge Weinstein's interpretation, a case like Gale would make no sense. In Gale, the Second Department held that their plaintiff had pleaded a misrepresentation, but it found plaintiff's claim failed because plaintiff hadn't read the misrepresentation. It's not requiring reliance, but it's requiring a causal nexus. So, too, in Stuttman, if you look at what Stuttman Why isn't there a causal nexus? But maybe we should come back to that after you make your first argument, because I have a problem with, first, what you say about Judge Weinstein. He had some thoughts, and he expressed them. But on the question about we have held in any number of cases that it is asymmetrical in how we review a denial and a grant, and we've held that. And, in the end, I don't think that's really terribly important, because the issue is whether there is certification. But this notion that Judge Weinstein was biased is really quite remarkable. I don't think it's about bias, Judge Calabresi. To your point on different standards of review, this Court most recently in Petrobras questioned whether that survives the Supreme Court's recent precedents and said if it had to get to it, it would take it in a We may question things, but as long as we have a case on our that has been decided, that case remains a case for our law. And we shouldn't reverse a district court because it follows what we have said. But, anyway, that isn't really the issue. The issue is, is there enough in common here for first Let me offer two quick responses to Your Honor's concern about the standards issue. First, I think if Judge Weinstein had followed through and actually resolved his doubts factually, he expressed doubts on deception, on causation, on injury over and over and over again. And when you get to the opinion, he doesn't resolve any of those doubts. He observes that the same things are lacking on the evidence. But by that argument, if that's what he did, then it doesn't matter what he said, right? Because if that's what he did, then he hasn't given us I agree, but Judge Livingston, I don't think you can ignore what he said on the presumptions. And both in the presumption section and the way he came out the case, he said this case cries out for a class-wide settlement. I can't understand why these parties haven't settled. You can't ignore that those things were in the mix when he decided this case. Could I ask you to address the argument about the deceptive statement? Because I look at the statute, and it seems to me that the statute almost seems to require that the meaning of the term flushable be shown by common proof. I mean, it's an objective standard that is to a reasonable consumer. So help me understand your argument about the problem with the proof as to certification on that. It is an objective standard, Your Honor, but I don't think that means what the inquiry is going to look like to show conformance is necessarily one size fits all, and that's the problem. If you Why isn't this, just for the reason that Judge Livingston said, the type of case for which class action was created? I mean, here you have one statement, flushable, that meets any number of people. You have something that no one individual is going to find worthwhile bringing because it's too trivial in terms of the cost. And if you put them together, the question is, what does to an ordinary person flushable mean? Why isn't that the I don't disagree with Your Honor about the question is, what does it mean to an ordinary reasonable person? I think it'd be one thing to forgive plaintiff's failure to demonstrate what it means to a reasonable person if the evidence showed that none of the definitions would require individualized proof. But the problem is that the definition that plaintiff himself testified he had, the one plaintiff's counsel said the consensus of consumers had, the one their expert said he had for consumers, required these individualized inquiries. There's nothing on this record to suggest that a consumer had any standard that was testable through objective evidence. What kind of case? You know, I'm not talking about the merits. You may very well win. But what kind of case would be suitable for class action if a case of this sort is not? 100% olive oil, I think, is a quintessential one, Judge Calabresi. A reasonable person is going to understand what 100% olive oil means. Indeed, that may be a case where you don't even need a consumer survey. Excuse me, but I make olive oil, and believe me, 100% olive oil is anything but that clear. I mean, you can have one kind of olive and another kind of olive. There's an entire 60 Minutes episode on that. Let me build out some further facts, then, Judge Calabresi and Judge Loyer. 100% olive oil, when the product that's being sold is a completely different commodity called pomace that's traded for less money in the commodities markets, I think that makes it a different case. I see I'm over my time, but if I could circle back to your question, Judge Loyer, about causation. I think the real problem here is causation and reliance often overlap, but they don't always overlap. And Stuttman makes that clear. Stuttman, when it's talking about why normally there's causation in these cases, says, and I think it's footnote two, that where you have a material omission, that satisfies the causation requirement. And what does the court cite there? It cites affiliated ute. Affiliated ute doesn't take individualized issues off the table. It just says you've got a presumption, but if there's a bunch of evidence that the person, excuse me, that the misrepresentation, in fact, had nothing to do with why the purchase was made or the security was purchased, they lose. So, too, here, look, it would be possible in some cases to even have reliance, but not causation. You think about a stock case where somebody's defrauded by their broker. The evidence might show the broker made horrible statements. There's reliance on the statements. They've got it that far. But if the evidence further reveals that not only has the person purchased that security, but the person purchases, let's say it's a securities market of A through Z. They not only purchased security A on which there are misreps, they purchased A through Z. And they just do it by rote. Reliance is met there, but causation is not. And that's the problem we have here. We're not requiring reliance. We're saying causation isn't met. This case sets up like Sergeant Benevolence, which, Your Honor, Judge Livingston wrote, it sets up like the 349 case that the Delaware Supreme Court dealt with in Teamsters. We know that even after Mr. Kurtz determined the representation was, in his view, false, he kept buying and kept buying at the offered price. Well, he kept – wait. You're over time, so we'll come back to that maybe on – Thank you, Your Honors. Thank you. May it please the Court, Brian Matsui on behalf of Costco. As Mr. Joyce mentioned, I'm going to address injury first and then Article III standing with respect to injunctive relief. Now, with respect to injury, the district court's certification decision is fatally flawed for three reasons. First, Kurtz's expert supported none of his three price premium theories with evidence, two of which were just mentioned in passing in a footnote. Second, the district court just assumed that there was a price premium injury here as a matter of common sense. And third, the court failed to address Costco's and Kimberly Clark's significant expert testimony demonstrating that the methods that Mr. Ware articulate in this case would not actually work. Your theory is that there needed to be a finding by a preponderance that this methodology could establish a price premium or not, that the question could be answered with the expert analysis that Dr. Ware proposed to do or Mr. Ware proposed to do. Yes, that's correct. That he needed to actually – And the judge didn't really address that. No, he did not. I mean, there is ample portions of the opinion where he recites various expert testimony but doesn't actually resolve any of the disputes. How much of that is an issue at class certification where it is said by your client and others how important the fact of flushability is and so on, and how much of it is a question and a very difficult question on the merits of the case, of actually showing that there has been damages or other things. That is, I'm confused about what you need to say that there is enough of a link to have a class because it looks likely that these people have this common injury of paying more because your own client says how important it is to their sales and that how important this is, and what it is that is needed then for them to show actual damages when you come down to it. And, you know, we all know that the problem is that if you get the class, then there tends to be settlements and all that. But that, for us as lawyers, in terms of the law, the question of which it is, is a very important difference. So that actually touches upon all three of my points, Your Honor. I mean, the first is that – The last is a much more important one to me, and I want to hear about it, about the injunction in standing. Well, with respect to the last point, there was ample evidence showing that hedonic regression and the survey techniques wouldn't work. I think starting with the survey techniques, these were only mentioned in a footnote. They're not at all tailored to the case. What we have here is nothing more from Kurtz's expert, a mere promise that he will eventually come up with a model. He didn't actually have a model in this case. All he basically did is said, I basically know of these techniques, hedonic regression, for example, which work in completely dissimilar circumstances, and then made a promise, an intention that he would be able to do that in some other case. Am I understanding this correctly? I mean, other cases might – this might be one factor going to whether certification is proper or not. But in this case, this expert is the basis for establishing class-wide injury, not just damage injury, and causation, essentially. That's correct, Your Honor. This is the only evidence that Kurtz has with respect to those requirements, and he didn't actually put forth any sort of model or evidence. This Court doesn't need to decide in this case what the floor is, what the bare minimum is as far as an expert to actually say a class can be certified, because in this case, we have an absolute absence of any sort of evidence that would indicate that you could actually do this on a class-wide basis in this very case. All he basically did was identify five attributes. He acknowledged that he had evidence, but then he didn't actually try to apply any of that evidence. The experts disputes whether the hedonic regression analysis can really work, but then goes through and says, well, maybe it might work, but there's not enough data. Is that right? In this case, no, Your Honor. He acknowledges that he has a lot of data. He says it's an iterative process, but he doesn't actually do anything with that data that he has available. No, no, no. One of the other experts, one of the opposing experts, I believe, says it's not likely to work, but maybe an analysis under the right circumstances can work, but there's not enough data. So we're not saying that hedonic regression could never work in any sort of case. I don't think that the Court would need to say that, but the fact is that under cases like Walmart and this Court's IPO decision, there needs to be convincing proof, and it certainly can't be enough that if an expert basically says there's this economic theory that I could potentially apply and I will eventually do, that can't be enough to certify a class. That means that cases like- He says that I can extract, if I have enough data, and I don't think that there's really right now a dispute about the sufficiency of the data. That might be at another stage. But I can extract the price or the premium associated with specific product attributes, right? Is that what he says? That's what Ware says he can do, but he says that that can be done because he cites journal articles, for example, where he looks at products like eggs that have organic eggs versus regular eggs that aren't organic, and he uses that theory to say that he could then apply that to flushable wipes. Now, the problem with that, as our experts explained, which the District Court never addressed, is there's no comparator product here that you can compare flushable wipes to. And so you won't know- Excuse me. You're saying that you can't compare unflushable to flushable? Is that the difference, that you have organic eggs but not organic eggs, but you don't have non-flushable to be compared with flushable? That's one of the problems with respect to hedonic regression in this case, and Ware certainly hasn't explained- You can go to the issue that you say that he keeps buying these if there's nothing else that he can buy that doesn't have this attribute. I mean, there seems to be an inconsistency. You're saying that one of his problems is that he keeps buying after he learns this, and yet if there's nothing else that he can buy that isn't, it's like saying, why does he keep buying organic eggs if they're the only ones on the market? Well, and I think that that underscores some of the problems with respect to hedonic regression in this case. As Dr. Martin explained, when you would basically have a situation where the market would fundamentally change if you took away the flushability representation, then you can't actually do the hedonic regression analysis. Dr. Martin concluded that this was a critically flawed analysis, not generally, but that it couldn't be applied in this case. That's correct, Your Honor. And did the judge resolve that conflict between the experts? Not at all, Your Honor. The district court here said that it was premature and declined to do that, and that's a problem because when you have an issue, even if it overlaps somewhat with the merits at the certification stage, under cases like IPO and Walmart, the district court needs to actually resolve that dispute. Now, to your point, Judge Calabresi, as to whether or not the flushability representation is a valuable attribute, there needs to be some evidence to demonstrate that there would be a price premium associated with that and that it could be shown on a class-wide basis. And there are cases like — At the class certification rather than at the merits stage. Yes, because there is an overlap here between the merits and the class certification. And we have here — sorry, Your Honor. You're way over time, and I just want to be sure that somebody on your side, whether it's this one or the Fiore, argues the injunction issue because that's a difficult issue. And I just don't know, you know, in this, who is going to be arguing it. You were going to address it. I was going to address the injunction. Why don't you take a few moments to address that? Certainly, Your Honor. I mean, the district court in this case violated Article III by certifying an injunctive relief class. As this Court is well aware, every form of relief must satisfy Article III's requirements, which means for an injunctive relief, Kurtz needed to show a certainly impending injury. This Court's Nicosia decision really is on all fours with what we have here. Kurtz has not — Basically, you're saying the district court is incorrect to say that there is standing because of the effect on New York customers generally, which is what the Court said. And I think, you know, I don't see how one can avoid that problem, that you have to have individual standing, not the whole thing of New York. But my question is this. If these people had said — and I'm not saying that they did — if they had said, we have to keep buying these and paying this higher price, which you're questioning whether there is, because we don't know whether these people will be telling the truth or not. It is something of that sort, which I don't know that they did. One of them certainly didn't, and the other one may have, but probably didn't. Would — that might have been enough for standing. So would the appropriate thing there is to send that back for possible amendment to see if they would be willing to — you know, if they amend their complaint to state something of that sort, that might establish standing, might not. But they wouldn't have asked to amend because they won. They won on what you say is an incorrect theory, and I'm inclined to agree with you. But would that be appropriate? No, Your Honor, it wouldn't. I mean, first of all, I don't — this Court has never held that that would confer Article III standing. I didn't say we did. I'm just saying that is a possibility that has not been discussed here. The district court itself was dubious about that. But in this case, with respect to Dr. Kurtz, he has provided no indication, has had ample opportunity to say whether or not he would buy flushable wipes in the future. He's been deposed already. He has been disposed, and he — I'm sorry, Judge. I didn't hear what you're — I just asked — I was just saying he's already been deposed. He has been deposed, and he said that he is not buying flushable wipes. There's no allegation in the complaint that would indicate that he has any indication. It would certainly seem to be prejudicial for the defendants to allow an amendment now at this stage in the litigation, which has been pending for four years. Yes, Your Honor. And there was ample opportunity for the plaintiff in this case to say that he intended to buy flushable wipes in the future. Thank you. If there are no further questions. May it please the Court. My name is Doug Willans, and I represent the plaintiff, Joseph Kurtz, who is a consumer of flushable wipe products advertised and sold by defendants Kimberly, Clark, and Costco. The district court did not abuse its discretion in certifying two New York class actions consisting of consumers who purchased wipes, and we allege that wipes are in violation of the New York consumer protection laws. In fact, I think the opinion shows that the district court rigorously analyzed the class certification requirements in this case. Your adversaries say that Judge Weinstein, in fact, didn't resolve these disputes between and among the experts on both sides. What's your response to that? I think if you look at the order and look at how he addressed it, he certainly summarized in the early part of his decision what each expert said. He laid out what Mr. Weir said about the hedonic regression and what that means. He then addressed the criticisms of that posed by both Kimberly Clark's expert and Costco's expert. And then later in the opinion, he said, I've reviewed that. I understand the criticisms. He cited back to those specific portions of his order and then said, I find that Mr. Weir's hedonic regression is sufficient to satisfy the predominance requirement of Rule 23. I think that's all that's required. I don't dispute. I think you aptly summarized the opinion. But he essentially, in one part of the opinion, lays out the different expert statements. Some of the expert statements do go to the question whether this analysis can be done at all. And then when he comes back to it many pages later, he has a lot to address. He basically says the model is sufficient for certification. He doesn't say why Martin's analysis doesn't trump Dr. Weir's, and he concludes that Dr. Weir will be able to perform this analysis and will be able to give us a definitive answer, price premium or not. And my concern in this case is it does seem that here in the structure of this case, this expert's testimony is essentially what is establishing the fact of injury and causation. And if I'm wrong about that, help me understand. No, I think our evidence of both causation and injury is predominantly relying upon both the decision, I'm sorry, the expert declaration and the rebuttal declaration of Mr. Weir. But I think if you wait, listen, did he do it perfectly and say A, B, C, and then here are the reasons why? No. But he did lay out all the reasons. He cross-referenced those reasons. And I think the importance here is that he – Is what you're saying, yes, I want to be clear. Is what you're saying that while he may not have said, I find this expert to be more believable than the other one, he didn't use what we so often call robotic incantations, but that his holding, in effect, had to mean that. Is that what you're saying? Yes, I think that's exactly. In other situations we have said that robotic incantations are not enough. But in a classic situation, do we require somebody to say something like that? I certainly agree with what you're saying. And I think that's right in that he certainly understood what the experts were saying. Did he say it in the most perfect way? I think it's a 130-page order we can go through, as both of us have done, and certainly nitpick and find he could have said things better, certainly on the pleading standards that day when he talked about a pleading burden. I think that was some inartful language. But if you look at the order as a whole, he did. If we disagreed with you, what should we do then? Do a Jacobson remand back to Judge Weinstein and say, did you hold this? I mean, what is it that would be wanted to do more if we don't agree with you that the decision, in effect, did that? If you're starting from the premise of if you disagree with me, I guess my preference would be that you send it back to Judge Weinstein so he can clear it up. I mean, I think that's certainly within the realm of what you can do. I obviously think that's not necessary, but that would be a preferable result to a reversal on the class certification issues. On the issue of predominance, the district court did have to make a finding to a standard of proof that predominance had been shown, right? And to the extent that Dr. Weir's testimony and ability to do this analysis establishes causation and injury, then you really seem to need to make a determination as to whether he can actually do what he says he's going to do, more than just saying . . . Sometimes some experts, you say, okay, let the jury hear it. But here, it does seem to me to be critical to your case. Well, I think you have to look at . . . we're still at the class certification stage. Critical to establishing the appropriate basis for class certification. Yes, and what Mr. Weir said, and what he said in his first declaration, what he said in his rebuttal declaration, both of which the court cited and referenced, is that these are all class issues. He said, one, here is the model I propose. Here is how it would work in practice. Here is the elements I will use to do that. And then he punctuated that by saying, and these are all class issues. It's all based on information that has nothing to do with any individual class member. So when you look at what he said, and he rebutted that very strongly in his rebuttal declaration, he said, no, the defendant's experts are incorrect. There's no individual inquiry here that's required to determine causation. The opposing counsel said that one of the problems with this way of doing, as against the Egg case, is that there is no alternative. That is not our theory of causation in this case, comparing it to a different product that's non-flushable. What Mr. Weir says he can do is he can isolate the attribute of flushability and then assign a price value to that. And that is where, so if he can do that, the price premium in and of itself establishes the injury, and the causation is it's related, it's attributable to that representation. That's what he's saying he can do. And he specifically addressed that in his rebuttal declaration and said, I'm not doing a side-by-side analysis of one product versus a non-flushable product. He's saying I can isolate this attribute, and he laid out exactly what he could do. It's been accepted in other cases. It's accepted in the literature that he cited. You can give a value to an attribute to something which is worth enough so that people are advertising and say that has a price value? Yes, that is what Mr. Weir says he can do in this case. He can do that based on certain data, including corporate documents, including how much is spent on certain attributes by the company and so on? I mean, it would be sales data. It would be company documents. I think he cited in his report he could get data from Amazon.com that shows sales information, and then he conducts his hedonic regression and provides a result. And if there is a price premium, then that's on the merits. If he cannot establish one, then we lose on the merits. But the point is what defendants are arguing is they want the merits now. They want us to show flushability can be determined now. It's a little better than that. They say if he can't do that, if the data that he would need, he referred to data sets, the experts on the other side said, I don't think the data is going to be available. If he can't do it, you can't establish injury with a price premium. And then we would lose on the merits. But if he can't do that and looking at the affidavits and the deposition and making a determination now, then the case shouldn't be certified, right? Because there's no way to establish injury or causation. But I think you're putting the cart before the horse. At class certification, all he is saying is that I have a model, this is how the model would work in practice, it applies class-wide, and therefore the class-wide issues. I guess, and this is very helpful, there's a merits question. If the judge determines that this analysis can be done by an expert and a definitive answer can arise, then you can use this as a method of establishing injury on a common basis. Correct. If, on the other hand, the data in the circumstances of this case doesn't exist, if there's no ability to run the regressions because of some flaw, and as one of the experts says, it's critically flawed as applied to the circumstances of this case, then if this is the only way you plan to show injury on a class-wide basis, then it would seem to me you haven't established by a preponderance that you can show injury on a class-wide basis. And I shouldn't think about that as one of the elements that goes into predominance or commonality. Well, I think still inherent in your question is there's a class-wide issue. We don't have to prove the injury exists now. Mr. Weir has said in his declaration that the information is out there. He said my process is iterative in that I have to run many multiple regressions. He said, but the information is available, I can use it, I can run this. He strenuously disagreed with defendant experts that anything is individualized here. It's all based on market information, sales information, and that if you go back and look at what Comcast . . . At least you're saying that this is a war between two experts, and that is not something that we have to decide now? Is that what you're saying? No. No, what I'm saying is that for a class certification, I would say on the ultimate merits of the case, and will his model actually establish an injury? No, no. That is a war of the experts that Judge Weinstein correctly said would occur later. What we're saying now and what Comcast says in a lot of decisions of this Court following is we just have to show that his model is susceptible of proving that there's a class-wide issue here. There's a difference between will it establish and can it establish in the circumstances of this case. Will it establish as the merits? Can it establish is a question that has to be grappled with at class certification. I think that's correct, and what Judge Weinstein said . . . Again, he may not have said it as artfully as defendants would have liked, but I certainly believe, if you look at the context of the opinion as a whole, that he looked at the class cert issues . . . otherwise he would have stopped it. The implication of the decision . . . You don't write this long a decision unless you believe that one of the experts . . . and this is a difficult set of issues, but one of the experts, in your case, Mr. or Dr. Weir, could establish, through this hedonic regression analysis, some commonality, some predominance. Yes. There's no way . . . I think, but maybe I'll be corrected to read this opinion and conclude that Judge Weinstein, who's a very smart person, didn't come to a conclusion, didn't arrive at some conclusion, even if he acknowledged it was close to equipoise, but we're talking about a preponderance, which is 51 percent.  He certainly did not abuse his discretion, which is, I think, the standard we're looking at here. I think it's very dangerous to assume that Judge Weinstein did not reach a conclusion. I think that would be a very dangerous thing. I think he did reach a conclusion. Could you address the injunction issue? Sure. I think when you have to look at what the law requires and what defendants are saying, that if you accept what they say is the standard under Article III, a consumer could never obtain an injunction. No, no, no. I don't believe . . . I mean, they may be arguing, but that's an argument that I have problems with, that somebody who is going to buy something because they know now that any time in the future they will not be . . . they don't have standing. That goes too far. But the argument I take it they are making is that this consumer has no intention of buying in the future. If this consumer had an intention of buying in the future, this consumer could say, given what they've done in the past, I don't know whether they're telling the truth or not, and that might be enough to grant standing. But they're saying that Judge Weinstein did not grant standing on that basis, that he granted standing on the basis of generalized harm to New York, and that that is not enough for Article III standing. And when I asked, but couldn't they then amend, having won, of course, they didn't need to ask for amend, but couldn't they amend to say that they want to buy in the future and then be harmed? And the answer they gave me is they stated, or at least Kurt stated quite clearly, that he had no intention whatever of buying. So my question is in that context, we're just standing, not on their theory, which . . . Okay. I think I understand what you're saying. I would say the short answer is there's no magic words in the complaint or in his deposition testimony where he says, I will continue to buy. But I think a point that defendants have made over and over again is even after he filed the complaint, he still continued to purchase these products. And what we say is that is sufficient because he purchased them but didn't . . . That sort of heads right into Nicosia. Look, as I told my law clerks, I'm a little surprised at the breadth of Nicosia, having been on the panel, but we said what we said. And we seem to have required in that case some more affirmative statement that I anticipate continuing to buy. Do you agree with that? I think Nicosia is very broad, as you say. I think a distinguishing factor in that case that is not present in this case is the fact that they took the products there off the market, so there was no need for injunction. Yeah, but we went beyond that. Yes. And then you said, well, there's no allegation in that complaint that he'll ever buy anything off Amazon again. Well, I think the conduct here shows that he does want to continue to buy these products. He never said, and I don't believe in going through his testimony, he ever affirmatively said, I will never buy these. I think that's an assumption. But that is not the basis on which the district court found standing for the injunction. I think he did not. No, you are correct that he didn't do that. So if it requires us to go back and add the magic words, I think we're certainly able to do that. Isn't that a little late? I'm sorry? Isn't that a little late? No, we're still at the class. I mean, listen, this case has been around a very long time, but we're still only at the class certification stage, and I think that it's certainly something that if that's the issue, I mean, he certainly intends to buy these products again. He just doesn't believe he can rely on the representation, which brings us to what we say is, you know, Nicosia is the standard in this case, but if you look at the Davidson case at the Ninth Circuit, which involved the same defendant, the same flushable wipe, and the Ninth Circuit came up with a two-pronged test that would cover Article III standing issues, and I guess our concern, I know you have a problem with it, Judge Calabresi. Well, you know. Not with the decision, but with. . . Article III standing is something that we have to find exists. Exactly. And a generalized statement about harm to people all over we have held any number of times is not enough to confer that standing. So I want to know whether that, what is sufficient for Article III standing is there. At that point, if there is Article III standing, then the damage to New York in general might be one of the issues, again, in the merits, but I've got to have Article III standing to begin with. Another point I was making is I think we have to be careful under Nicosia and even under Davidson of interpreting Article III standing too narrowly such that no consumer could obtain the injunctive relief provided under the consumer protection statutes. Unless the panel has any other questions, I rely on the arguments in my papers and request that the Court affirm the district court's judgment. Thank you. Thank you, Your Honor. I'd like to just turn back to injury briefly. I think that what we have here with Mr. Ware is a promise to do something, not actually any sort of attempt to do something. And I think that that's important when we look at the context of class certifications in general because if it can be such that an expert really only needs to go in and say there's this mathematical technique and then not actually apply it to the facts of the case, and then that's enough to say that there are common issues that warrant class-wide certification of injury, then that means every 349 case will be certifiable on the injury requirement because . . . Would you then address on top of Mr. or Dr. Ware the assumption that was made, I guess, or the description by Judge Weinstein of these other factors? You know, the fact that people don't buy flushable wipes just because they're flushable wipes. There's got to be some premium associated with it. I'm just articulating, I think, what he called a common-sense view. Yes, Your Honor, and I think that's just the . . . It's not just this battle of the experts. But that wouldn't be a price-premium injury. That's the problem here. Just because consumers would buy something because they like that attribute doesn't mean that they paid a price premium for that. But the question before us is if there is all of that . . . If there is, I'm not saying there is, all of this common-sense notion that people are buying these and that your client is pushing these and spending money on these because they have . . . Then is it in that context enough, in that particular context, to have an expert who says, I will be able to show to you that there is a price plus? That's the question. If there weren't any indication of that sort, then somebody saying, I may be able in the future to say something, might look like something. But it might conceivably look different in a context where most people would say, yeah, well, that's what's going on, but can these people prove something? And the guy says, yeah, I'll be able to. But again, Your Honor, that's not actually evidence. It's a mere assumption. Now we have products that are out there, like in the McLaughlin case. You had light cigarettes and full-flavored cigarettes, and the light was a valuable attribute. And yet those cigarettes were always priced the same. You have Diet Coke and regular . . . The McLaughlin case turned up a question of reliance. And so we're back to the difference between reliance and causation. And McLaughlin went specifically on reliance, and that's not an issue here. Causation is an issue, and they are separate. I'm very focused on causation. But what I'm showing, though, Your Honor, is that just because there's an attribute that may drive the market, such as Coke and Diet Coke, you have a diet label that drives the market. But Diet Coke is always priced the same as regular Coke. You can't just assume that there's a price premium in the case. And if you did, then that means plaintiffs would be better off in cases like Comcast and McLaughlin. In all these cases, not actually having their expert do any of the work to show that it could be tailored to the case, because that's what would get them in trouble. Can I ask you something about the consumer survey or the absence of a consumer survey? If they had had a consumer survey, just say, in the context of the New York class action, where the survey showed that consumers were willing to pay a slightly higher price for the flushability or dispersibility of these wipes, would that make a difference? That certainly would be some evidence. As Dr. Ugon and Dr. Martin explained, the problem with consumer surveys is they just measure consumer preference. They're not actually tethered to the supply side. And so the fact that a consumer might be willing to pay more doesn't actually indicate whether or not the manufacturer would actually be charging more. Like Coke and Diet Coke, they want to sell more soda, so they don't actually charge more. So you're telling me that if Procter & Gamble finds out that consumers are prepared to pay more, they wouldn't charge more? They may be able to sell less of the product if they actually charge more. And so they may be better off actually charging less than whatever alternative products might be there. That's what Dr. Martin said, that there were times when you looked at baby wipes versus flushable wipes, baby wipes would cost more, even though they didn't have any sort of flushability representation. That's why this case is really about a failure of proof on the part of the expert. Your economics is killing me on the notion that something is desirable and a seller does not charge more for it. I'm sorry, but I'm having a little bit of trouble with e-content on that. If there are no further questions, we would ask the Court to reverse. Thank you. Thank you. Thank you very much. We'll take it under advisement, well argued by both sides. Thank you. Yes, very well argued. Thank you both.